Opinión disidente emitida por el
Juez Presidente Señor Hernández Denton, a la cual se une la Jueza Asociada Señora Fiol Matta.
El reclamo sobre el derecho a escoltas policiacas instado por los ex gobernadores Rafael Hernández Colón y Carlos Romero Barceló, quienes por años ocuparon el más alto cargo en el servicio público de nuestro país, es, sin duda, uno que debe dilucidarse en los tribunales. Ello no supone, sin embargo, que la intervención judicial pueda hacerse a base de un lacónico expediente ni, mucho menos, mediante *160 un recurso de revisión administrativa ante el Tribunal de Apelaciones o ante este Tribunal, contra una prohibición clara de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.) que expresamente excluye a las órdenes ejecutivas y a la Oficina del Gobernador del alcance de sus disposiciones sobre revisión judicial.
Como la opinión que hoy emite una mayoría de este Tribunal hace precisamente eso, nos vemos obligados a disentir. Contrario al razonamiento de la mayoría, entendemos que la acción que realmente afectó a . los ex Gobernadores fue la orden ejecutiva emitida por el entonces gobernador Aníbal Acevedo Vilá, la cual por mandato expreso de la L.P.A.U. está excluida de las disposiciones de dicho estatuto.
Aún así, la acción que impugnan los ex Gobernadores no puede estar inmune a la revisión judicial, pues ello equivaldría a otorgarle nuestro aval a un régimen de gobierno por decreto y a privar de un remedio a los ciudadanos que se vean afectados por éste. Por lo tanto, resolveríamos que el procedimiento jurídicamente correcto para dirimir la disputa objeto de este caso es el mecanismo de sentencia declaratoria, no el recurso de revisión administrativa, y remitiríamos el asunto al Tribunal de Primera Instancia.
I
La controversia del presente caso se originó el 17 de mayo de 2006, cuando el entonces gobernador Aníbal Acevedo Vilá súbitamente cursó una misiva al Superintendente de la Policía, Ledo. Pedro Toledo Dávila, para ordenar la reducción y eventual suspensión del servicio de escoltas que se le proveía a los ex Gobernadores. En su decreto, el gobernador Acevedo Vilá expresó lo siguiente:
En el caso de los ex-Gobemadores, deberá quedar reducido a la mitad el personal que presta servicio de escolta para ellos *161 efectivo el 31 de agosto de 2006, y suspendido en su totalidad para el 31 de diciembre de 2006. No obstante, quedará coordinado mi plan de rondas preventivas con la Policía de Puerto Rico que provea seguridad a las residencias y oficinas de estos ex funcionarios que han brindado el más alto servicio público a nuestro País. Apéndice de la Petición de certiorari, Caso Núm. 07-347, pág. 135.
Tras enterarse de que el servicio de protección de escoltas les sería suspendido, los ex gobernadores Hernández Colón y Romero Barceló enviaron sendas comunicaciones escritas al Superintendente para cuestionarle dicha determinación, pues, a su juicio, tenían un derecho adquirido sobre el referido servicio. Específicamente, el representante legal del ex gobernador Hernández Colón cursó una carta al licenciado Toledo Dávila en la cual le solicitó que dejara sin efecto “la Orden para privar de la seguridad y protección que le brinda la Policía de Puerto Rico a los ex Gobernadores”. (Enfasis suplido.) Apéndice de la Petición de certiorari, Caso Núm. CC-07-347, pág. 137. En la alternativa, solicitó que se le proveyera una audiencia y que no se redujera el servicio de escoltas hasta tanto se cumplieran con las garantías del debido proceso de ley.
En respuesta a dicha comunicación, el licenciado Toledo Dávila suscribió una carta en la que indicó que el servicio de escolta al ex gobernador Hernández Colón sería suspendido en su totalidad efectivo el 31 de diciembre de 2006. Ello, señaló el Superintendente, “a tenor con el Memorando emitido el diecisiete (17) de mayo de 2006, mediante el cual el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Aníbal Acevedo Vilá, ordenó que a dicha fecha debe quedar suspendido el servicio de escolta a todos los ex Gobernadores ...”. (Enfasis suplido.) Aparte de esa aseveración, la única expresión adicional del Superintendente en la referida carta fue hacer constar los periodos de tiempo en que el ex gobernador Hernández Colón disfrutó del servicio de escoltas, conforme a una solicitud que el *162 representante legal del ex mandatario le hizo a tales efectos.(1)
Por otra parte, el representante legal del ex gobernador Romero Barceló envió una comunicación al Superintendente, en la cual solicitó remedios iguales a los que había requerido el ex gobernador Hernández Colón. Entre éstos, pidió que se dejara sin efecto “la Orden emitida mediante comunicación del 17 de mayo de 2006”. (Énfasis suplido.) Apéndice de la Solicitud de certiorari, Caso Núm. CC-07-356, pág. 119. A esta petición, el licenciado Toledo Dávila respondió: “Sobre el particular, me circunscribo a informarle lo siguiente: que efectivo el treinta y uno (31) de diciembre de 2006, le será suspendido en su totalidad, el servicio de escolta.” (Énfasis suplido.) Id., pág. 121. Al igual que en la carta dirigida al ex Gobernador Hernández Colón, el Superintendente expuso que ello respondía a la directriz de 17 de mayo de 2006 del entonces Gobernador.
Ante esta negativa a celebrar una vista, los ex mandatarios acudieron al Tribunal de Apelaciones mediante sen-dos recursos de revisión administrativa. En esencia, ambos alegaron que el Superintendente erró al negarles su petición para que se les continuara brindando el servicio de escoltas y al no reconocer que tenían un derecho adquirido sobre dicha protección. En sus respectivos recursos de revisión, ambos ex Gobernadores señalaron que el licenciado Toledo Dávila ordenó a la Unidad de Seguridad y Protección de la Policía el cese del servicio de escoltas en las fechas y maneras indicadas por el gobernador Acevedo Vilá. Reconocieron, además, que la actuación del Superintendente se hizo al amparo y en ejecución de una orden del *163 Primer Ejecutivo, y adujeron que ésta les privó de un derecho adquirido sin cumplir con el debido proceso de ley.
Por su parte, el Procurador General presentó una moción de desestimación en la que alegó que el tribunal apelativo carecía de jurisdicción pues, según expuso, la decisión del Superintendente no se basó en el ejercicio de sus facultades administrativas, sino en el cumplimiento de una orden ejecutiva del Gobernador. Ambos ex Gobernadores se opusieron a la moción del Procurador General y adujeron que la directriz del gobernador Acevedo Vilá no constituyó una orden ejecutiva debido a que no se cumplió con las formalidades y el procedimiento que de costumbre se sigue para aprobar dichas órdenes.
Entretanto, en diciembre de 2006, el gobernador Acevedo Vilá vetó el Proyecto del Senado 121 de 2 de enero de 2005 (P. del S. 121), cuyo objetivo era, precisamente, enmendar el Art. 30 de la Ley de la Policía, 25 L.P.R.A. see. 3129, para regular lo concerniente al servicio de escoltas de los ex Gobernadores.(2) En lo pertinente, dicho proyecto establecía que todo Gobernador que hubiese juramentado a su cargo luego del 2 de enero de 2009 tendría derecho a servicios de seguridad y protección durante los diez años siguientes al término de su incumbencia. Transcurrido ese *164 periodo, el servicio de escolta se proveería previa solicitud al Gobernador, quien debía contar con una recomendación del Superintendente sobre si se justificaba la concesión de la referida protección.
Sin embargo, respecto a aquellos ex Gobernadores que hubiesen ocupado el cargo antes del 1 de enero de 2009, el proyecto establecía que éstos continuarían recibiendo el servicio de escolta por un término vitalicio. Según se desprende de la exposición de motivos del proyecto, ello respondía a que dichos ex Gobernadores tenían “un derecho por uso y costumbre”, por lo que “[e]l negarle esos servicios de seguridad y protección que desde el primer gobernador electo se les ha brindado a todos, equivaldría a despojar a los ex Gobernadores de un derecho adquirido”. Exposición de Motivos, P. del S. 121, pág. 2. Cabe señalar que de la referida exposición de motivos surge que se tomó en cuenta, además, que “la eliminación o reducción de las escoltas no generaría los ahorros que originalmente se habían contemplado ...”. íd. No obstante, dicha medida nunca se convirtió en ley.
Luego de otros trámites, el Tribunal de Apelaciones desestimó ambos recursos de revisión por falta de jurisdicción, tras concluir que la acción administrativa no fue producto de un procedimiento adjudicativo. Específicamente, dicho foro entendió que la acción del Superintendente está enmarcada en la discreción de la Policía, por lo que no es revisable judicialmente.
Ambos ex Gobernadores acudieron ante nos mediante sendas peticiones de certiorari. El ex gobernador Romero Barceló alegó que el foro apelativo erró al desestimar su recurso, mientras que el ex mandatario Hernández Colón esbozó varios señalamientos de error, entre ellos que el tribunal apelativo erró al resolver que la decisión del Superintendente era discrecional y no podía ser revisada por los tribunales. Por otro lado, el Procurador General ha reiterado en su alegato ante este Foro su argumento de que la *165 controversia no es revisable mediante el recurso de revisión administrativa.
En este contexto, hoy una mayoría del Tribunal resuelve que el recurso de revisión administrativa era el único que los peticionarios tenían disponible para esgrimir sus planteamientos. Al así proceder, la mayoría pasa por alto que la acción que los ex mandatarios realmente cuestionan es la orden del entonces gobernador Acevedo Vilá, lo que, como veremos, excede los parámetros claros de revisión judicial preceptuados en la L.P.A. U.
II
Al evaluar el caso ante nuestra consideración, reconocemos que la reclamación de los ex gobernadores Hernández Colón y Romero Barceló, quienes luego de culminar sus funciones como Primeros Ejecutivos han permanecido activos en el quehacer público de nuestro país, y quienes tras concluir sus términos han recibido el servicio de escoltas, es de interés público, por lo que debe dilucidarse con premura por el Foro Judicial. No obstante, la letra clara de las disposiciones aplicables de la L.P.A.U. nos obliga a discrepar del curso de acción seguido por la mayoría del Tribunal.
La See. 4.2 de la L.P.A.U., que regula lo referente a la revisión judicial de las decisiones administrativas, limita dicha revisión a las órdenes o resoluciones finales de las agencias. 3 L.P.R.A. see. 2172. Véase, además, el Art. 4.006 de la Ley de la Judicatura, 4 L.P.R.A. sec. 24y(c). Para determinar si un asunto es revisable por la vía administrativa debemos acudir entonces a la Sec. 1.3 del estatuto, la cual define “orden o resolución” como “cualquier decisión o acción agencial de aplicación particular que adjudique derechos u obligaciones de una o más personas específicas, o que imponga penalidades o sanciones administrativas [,] *166 excluyendo órdenes ejecutivas emitidas por el Gobernador”. (Énfasis suplido.) 3 L.P.R.A. sec. 2102(f). De esta forma, es evidente que conforme a la letra clara de la L.P.A.U. no procede la revisión administrativa de una orden ejecutiva del Gobernador.
Esta conclusión encuentra apoyo adicional en el inciso (a) de la Sec. 1.3 del estatuto, la cual excluye del ámbito de aplicación de la L.P.A.U. a la “Oficina del Gobernador y todas sus oficinas adscritas exceptuando aquéllas en donde se haya expresado literalmente la aplicación de las disposiciones de [la L.P.A.U.]”. 3 L.P.R.A. sec. 2102(a)(3). El texto actual de dicha exclusión respondió a una enmienda introducida por la Ley Núm. 190 de 17 de agosto de 2002, ya que la versión original de la L.P.A.U. sólo contemplaba como excepción la “Oficina Propia del Gobernador”. Así, el legislador quiso dejar claro el alcance de la referida excepción, tomando en cuenta que algunas de las oficinas adscritas a la Oficina del Gobernador son establecidas para ser entes facilitadores de la política pública. Véase Exposición de Motivos de la Ley Núm. 190 de 17 de agosto de 2002, (Parte 1) Leyes de Puerto Rico 825.
En el caso de autos, la acción que se pretende cuestionar fue, exactamente, una directriz del ex gobernador Acevedo Vilá, en la cual éste le ordenó al entonces Superintendente que redujera y, eventualmente, suspendiera en su totalidad las escoltas provistas a los ex Gobernadores, lo que incluyó a los peticionarios. En las misivas cursadas al licenciado Toledo Dávila, los ex gobernadores Romero Barceló y Hernández Colón solicitaron que se dejara sin efecto dicha orden. Además, en los recursos de revisión administrativa presentados por los ex mandatarios ante el Tribunal de Apelaciones éstos reconocieron que la actuación del Superintendente obedeció a la orden del Gobernador. En efecto, en sus respectivas respuestas a las cartas enviadas por los representantes legales de los ex Gobernadores, el *167 licenciado Toledo Dávila se limitó a expresar que la cancelación del servicio de escoltas respondía a la orden del Primer Ejecutivo.
Lo anterior apunta a que el decreto impugnado constituyó una orden ejecutiva que, como hemos indicado, se encuentra fuera del alcance de la L.P.A. U. Si bien no existen parámetros constitucionales o estatutarios que regulen específicamente el poder del Gobernador para emitir órdenes ejecutivas, éstas se han definido como un “mandato que el primer ejecutivo da a los componentes de la rama ejecutiva”. W. Vázquez Irizarry, Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 (Núm. 4) Rev. Jur. U.P.R. 951, 953 (2007). Usualmente, la orden ejecutiva se dirige a la persona, agencia o entidad concernida para que proceda conforme con la directriz expresada en ésta. G. Igartúa de la Rosa, Aspectos legales: Promulgaciones de órdenes ejecutivas y proclamas por el Gobernador de Puerto Rico, 21 Rev. Der. P.R. 271, 273 (1982); Op. See. Just. Núm. 5 de 27 de febrero de 1985; Op. Sec. Just. Núm. 2 de 6 de febrero de 1968.
Se trata de un mecanismo cuyo origen, al igual que en la jurisdicción federal, lo encontramos en la práctica. J. J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 257. Éste es consustancial con las facultades del Gobernador como autoridad máxima del Poder Ejecutivo. Claro está, dichas órdenes no pueden ser contrarias a la Constitución ni a las leyes. Soto v. Adm. Inst. Juveniles, 148 D.P.R. 810, 826 (1999).
Conforme a lo anterior, aunque de ordinario las órdenes ejecutivas se emiten a través de un documento formal, ello no constituye un requisito de ley. Vázquez Irizarry, supra, págs. 953 y 1020. En este sentido, las formalidades y atributos propios de las órdenes ejecutivas son producto de un uso y costumbre, plasmado precisamente en una orden eje *168 cutiva promulgada el 29 de enero de 1990.(3) íd., págs. 953 y 1022-1023. De ahí que sea la naturaleza o sustancia de la directriz, no su forma, lo determinante al considerar si nos encontramos ante un mandato del Primer Ejecutivo, íd., pág. 1020. Véase, además, Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, Memorandum for the Counsel to the President, en www.usdoj.gov/olc/predirective.htm (visitado por última ocasión el 28 de septiembre de 2009).
En el caso de autos, el gobernador Acevedo Vilá impartió una instrucción de naturaleza obligatoria para el jefe de uno de los componentes de la Rama Ejecutiva, el Superintendente de la Policía. La directriz emitida por el ex Gobernador constituyó un mandato que el entonces Superintendente, como subalterno, estaba obligado a acatar. Así se desprende de las cartas que el licenciado Toledo Dávila cursó a los representantes legales de los ex mandatarios, en las cuales expresó que la suspensión del servicio de escoltas obedeció a la directriz del Primer Ejecutivo. Tratándose de una orden a un subordinado, su incumplimiento hubiese acarreado consecuencias disciplinarias. Véanse: Shapp v. Butera, 348 A.2d 910, 913 (1975); Nota, Gubernatorial Executive Orders as Devices for Administrative Direction and Control, 50 (Núm. 1) Iowa L. Rev. 78 (1964). Elio cobra particular importancia en el caso del Superintendente, pues la propia Ley de la Policía preceptúa que el Gobernador ejercerá la “autoridad suprema” sobre dicho organismo. 25 L.P.R.A. see. 3103.
Ante tales circunstancias, consideramos qqe le asiste la razón al Procurador General. Por mandato expreso de la L.P.A. U., no procede la revisión administrativa de la determinación del ex Gobernador.
No obstante, dicha conclusión categórica no coloca la ac *169 tuación del ex gobernador Acevedo Vilá fuera del alcance de los foros judiciales. Por tratarse de un proceder unilateral de parte del entonces Primer Ejecutivo, que tuvo un efecto real y palpable sobre los peticionarios que, según alegan, podría colocar en riesgo sus vidas, su orden no puede escapar la revisión judicial. Lo contrario implicaría avalar un régimen de gobierno por decreto ejecutivo que se podría prestar para actuaciones arbitrarias, en detrimento de los intereses y derechos de los ciudadanos.
Conforme a lo anterior, entendemos que el procedimiento jurídicamente correcto para dilucidar la controversia ante nos es el mecanismo de sentencia declaratoria. Este le permite al foro de instancia declarar “derechos, estados y otras relaciones jurídicas”. 32 L.P.R.A. Ap. Ill, R. 59.1. Hemos resuelto que el referido vehículo procesal es adecuado para determinar el alcance e interpretación de un estatuto y para dirimir una controversia en la que se presenten planteamientos constitucionales. Asoc. de Periodistas v. González, 127 D.P.R. 704, 723-724 (1991); P.P.D. v. Gobernador, 111 D.P.R. 8, 13 (1981).
El procedimiento de sentencia declaratoria ofrece a las partes amplias garantías y oportunidades para que presenten prueba en apoyo de sus posiciones. Moscoso v. Rivera, 76 D.P.R. 481, 495 (1954). Véase 32 L.P.R.A. Ap. III, R. 59.5. En el caso de autos, precisamente, entendemos que era necesario remitir el asunto al foro de instancia para que se le proveyera dicha oportunidad a los peticionarios, de manera que pudieran sustentar su alegación de que tienen un derecho adquirido sobre el servicio de protección de escoltas policiacas por el transcurso del tiempo, o de acuerdo con lo dispuesto en el Art. 30 de la Ley de la Policía, supra. Además, podrían demostrar las circunstancias particulares de cada uno para justificar la necesidad de la protección policiaca que solicitan. Por no haberse hecho así, el expediente ante nuestra consideración está desprovisto de elementos que le permitan a este Tribunal formu *170 lar un juicio adecuado sobre la controversia.(4) En este sentido, el Tribunal de Apelaciones debió remitir el caso al foro de instancia para que ambas partes presentaran prueba que tienda a demostrar la existencia o inexistencia del alegado derecho adquirido.
Desafortunadamente, la decisión que hoy toma la mayoría del Tribunal no toma estos asuntos en consideración. De hecho, los peticionarios nunca tuvieron la oportunidad de probar que las actuaciones del entonces Superintendente y de sus predecesores crearon un estado de derecho más allá del privilegio a recibir protección mediante las escoltas. Incluso, el Tribunal resuelve que cada una de las misivas cursadas por el Superintendente a los representantes legales de los ex Gobernadores constituye una orden o resolución final revisable ante el Tribunal de Apelaciones. Sin embargo, dichas cartas no contienen determinaciones de hechos y conclusiones de derecho, ni advierten sobre la disponibilidad de algún recurso de reconsideración o revisión. Tampoco son producto de un procedimiento adjudicativo. 3 L.P.R.A. see. 2164.
Ill
Por otro lado, quisiéramos hacer constar una razón adicional que nos lleva a discrepar de la metodología que em-plea la opinión del Tribunal para atender la controversia del caso de autos. El fundamento principal en que se am-para la mayoría del Tribunal para concluir que los ex gobernadores Hernández Colón y Romero Barceló tienen derecho a las escoltas policiacas es la llamada doctrina del *171 “re-enactment”, la cual es de dudosa aplicación a las circunstancias de este caso.
Específicamente, el razonamiento de la mayoría consiste en que: primero, por décadas la Policía le ha ofrecido a los ex Gobernadores el servicio de escoltas a base de su interpretación del Art. 3 de la Ley de la Policía, 25 L.P.R.A. see. 3102; segundo, que el legislador siempre ha conocido la práctica de la Policía, y tercero, que el legislador, aunque ha enmendado la Ley de la Policía, no ha prohibido dicha práctica, por lo que debemos entender que ha consentido a ésta. En otras palabras, la mayoría parte de una premisa fundamental, pero inarticulada, que no debe pasar desapercibida: el silencio del legislador es fuente de Derecho en nuestro país.
Esta teoría, como poco, nos parece un contrasentido. No vemos cómo el dejar de legislar puede implicar precisamente lo contrario, es decir, que se ha legislado. Peor aún, si descifrar la intención del Poder Legislativo ha sido en ocasiones un ejercicio complejo en casos en que esa rama de gobierno ha ejercido su facultad constitucional, resultaría imposible e impermisible interpretar dicha intención cuando no lo ha hecho. Véase L.H. Tribe, Constitutional Choices, Cambridge y Londres, Harvard University Press, 1985, pág. 31.
En este caso, la mayoría se ampara en un pasaje de Román v. Superintendente de la Policía, 93 D.P.R. 685 (1966), para sugerir que la doctrina del “re-enactment” ha sido adoptada por este Tribunal. No obstante, basta con examinar la opinión del Tribunal emitida en esa ocasión para concluir que el texto citado en la decisión que hoy avala la mayoría constituye un mero dictum. En Román v. Superintendente de la Policía, supra, este Foro resolvió que conforme a la letra clara de la ley allí en controversia procedía otorgar cierto beneficio a los veteranos. Aunque lo anterior era suficiente para disponer del caso, el Tribunal expresó que en el supuesto de que “estuviéramos ante un *172 estatuto de dudoso texto que demandara interpretación”, como el legislador al enmendarlo no había alterado o repudiado la interpretación administrativa de la disposición específica, debía entenderse que la había sancionado. Id., pág. 690. Adviértase que en ese caso el fundamento que llevó al Tribunal a resolver la controversia fue la letra clara de la ley. No creemos que las expresiones del Tribunal a modo de obiter dictum, que no constituyeron el fundamento de este Foro para disponer del caso en aquella ocasión, sean suficientes para concluir que anteriormente hemos avalado la doctrina del “re-enactment”.
Por otra parte, nos parece desatinada la conclusión de la mayoría a los efectos de que el historial legislativo del P. del S. 121, el cual fue vetado por el Primer Ejecutivo, re-vela que el legislador estatuyó, con su consentimiento implícito a una práctica administrativa que se llevó a cabo por décadas, un derecho vitalicio a escoltas para los ex Gobernadores. Tal ejercicio de interpretación, además de constituir un análisis de la intención legislativa de un proyecto que nunca se convirtió en ley, nos parece un intento fútil de adivinar lo que hubo en la mente de los miembros de la Asamblea Legislativa. Realmente, no tenemos manera de interpretar el silencio legislativo en este caso.
Muestra clara de lo anterior es que actualmente hay un Proyecto del Senado —el P. del S. 329 de . 2 de febrero de 2009— que parece ir en dirección opuesta a la intención legislativa del P. del S. 121 y a lo que hoy resuelve la mayoría del Tribunal. El P. del S. 329, al igual que el P. del S. 121, fue presentado por la Hon. Senadora Norma Burgos Andújar y persigue enmendar el Art. 30 de la Ley de la Policía, supra, para establecer la naturaleza y extensión del servicio de escolta. Sin embargo, a diferencia del P. del S. 121, el proyecto actual no reconoce expresamente a los ex Gobernadores como acreedores del servicio de escoltas. Más bien, parece agrupar a todos los ex funcionarios en un solo artículo que requiere previa autorización del Goberna *173 dor, en consideración a una recomendación del Superintendente, para proveer el referido servicio.
Según surge de la exposición de motivos del P. del S. 329, lo que lo motivó fue “el uso de cifras millonarias para servicios de escolta y la falta de normas más específicas y prudentes que rijan su uso”. Exposición de Motivos, P. del S. 329, pág. 2. Evidentemente, lo anterior contradice gravemente el aparente consentimiento implícito legislativo en el que descansa la mayoría del Tribunal y pone en tela de juicio la aplicación de la teoría de “re-enactment” al caso de autos.
Esta práctica también resulta nociva a nuestro sistema democrático de gobierno en la medida en que despoja a la ciudadanía de la confiabilidad y certeza que ofrece un estado de derecho plasmado en las leyes aprobadas por los otros poderes del Estado. En este sentido, resultan muy significativas las palabras del profesor Tribe:
Cuando el conjunto de poderes del Ejecutivo, de la Rama Judicial o de los estados respecto a determinado asunto sólo puede ser transformado por aprobación o desaprobación del Congreso, entonces es esencial que esa aprobación o desaprobación tome la forma de legislación hecha a través de los procedimientos formales de votación bicameral y presentación al Presidente, conforme al Artículo I [de la Constitución de los Estados Unidos]. Dado que el Congreso no puede legislar mediante la movida informal de dejar señales y pistas, los tribunales no deben tratar esas señales y pistas como si expresaran la intención del Congreso o como si constituyeran la ley; hacerlo es rehuir responsabilidad, en vez de asumirla, distorsionando nuestro sistema constitucional para la aprobación de las leyes. (Cita omitida, y traducción y énfasis nuestros.) L.H. Tribe, American Constitutional Law, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Vol. 1, pág. 205.
En fin, discrepamos de la teoría adoptada por la mayoría del Tribunal al conferirle autoridad interpretativa al silencio del legislador. Más aún cuando en este caso el legislador se ha expresado sobre el asunto al aprobar el Art. 30 de la Ley de la Policía, supra. A nuestro juicio, una de las controversias que debió dilucidarse mediante el proce *174 dimiento de sentencia declaratoria es, justamente, si conforme a dicha disposición los peticionarios tenían derecho al servicio de escoltas o si éste ha sido más bien un privilegio concedido a los peticionarios.
IV
A modo de epílogo, debemos llamar la atención a un asunto procesal que surge a raíz del reciente precedente de Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408 (2009). En esa ocasión, la Sra. Arlene Santiago Velázquez, quien tenía la custodia de sus hijas luego de su divorcio del Dr. Oscar Crespo Quiñones, fue demandada por su ex esposo mediante un procedimiento de desahucio. Paralelamente, la señora Santiago Velázquez presentó ante el foro de instancia una petición de hogar seguro sobre el mismo bien inmueble involucrado en la acción de desahucio. Tras apelar la sentencia del tribunal de instancia que ordenó su lanzamiento y pendiente aún la petición de hogar seguro, el Tribunal de Apelaciones desestimó el recurso de la señora Santiago Velázquez porque ésta no prestó la fianza requerida por ley para su apelación. La señora Santiago Velázquez recurrió ante nos y, entre otras cosas, cuestionó la improcedencia de la acción sumaria de desahucio en vista de su petición de hogar seguro. Ello, a nuestro juicio, requería que este Tribunal se expresara sobre la incompatibilidad del procedimiento sumario de una acción de desahucio con una reclamación paralela de hogar seguro sobre el mismo bien inmueble.
Ante esos hechos, sin embargo, una mayoría de este Tribunal se negó a atender los méritos de la referida controversia. Más bien, de acuerdo con un presunto mandato legislativo, pautó de forma diáfana que “\c]uando determinemos que el Tribunal de Apelaciones sí tenía jurisdicción para atender el recurso, procede devolverlo a ese foro intermedio para que resuelva los méritos de la contro *175 versia entre las partes”. (Énfasis suplido.) Crespo Quiñones v. Santiago Velázquez, supra, pág. 411. Precisamente, en el presente caso, el foro apelativo desestimó los recursos tras determinar que carecía de jurisdicción, ya que a su juicio el asunto correspondía a la discreción del Superintendente. No obstante, contrario a la norma pautada en Crespo Quiñones, la Opinión del Tribunal concluye que el Tribunal de Apelaciones tenía jurisdicción sobre el caso pero, en vez de devolverlo a dicho foro —como se hizo en el referido precedente— opta por resolverlo en sus méritos.
Enfrentada a esa realidad, la mayoría se ha visto obligada a intentar distinguir lo resuelto en dicho precedente del caso de autos. En ese intento, expone que en este caso, a diferencia de Crespo Quiñones, estamos ante un “asunto normativo y de alto interés público”. Sin embargo, como hemos indicado, en Crespo Quiñones este Foro tuvo ante sí la controversia sobre la incompatibilidad entre un procedimiento sumario de desahucio —que afectaría a las hijas menores de edad del propio demandante— y una reclamación de hogar seguro, cuestión que evidentemente entrañaba consideraciones de interés público y ameritaba nuestra intervención. Por ello, la “distinción” que se esboza en la Opinión del Tribunal nos resulta a todas luces improcedente y, sobre todo, preocupante, pues parece sugerir que lo “normativo” y el “interés público” son conceptos en ex-tremo maleables, cuya aplicación dependerá de los casos particulares que estén ante la consideración del Tribunal.
Por otro lado, la mayoría sostiene que en el caso de autos, a diferencia de Crespo Quiñones, el foro apelativo atendió los méritos de la controversia a pesar de que se declaró sin jurisdicción. En virtud de lo anterior, existe ahora una excepción a la norma pautada hace apenas dos meses: si el Tribunal de Apelaciones resuelve que no tiene jurisdicción, pero de todos modos se pronuncia sobre los méritos de la controversia, entonces este Tribunal puede atender el asunto. En otras palabras, en estos casos la autoridad de *176 cisoria de este Foro entra en vigor en virtud de los pronunciamientos emitidos sin jurisdicción por el foro apelativo, o sea, en virtud de dictámenes ineficaces.
No cabe duda, a nuestro juicio, de que en su afán por preservar la norma pautada en Crespo Quiñones, la mayoría ha comenzado a diseñar excepciones que modifican las reglas básicas sobre jurisdicción que rigen en nuestro ordenamiento y que crean confusión entre la comunidad jurídica.
V
En vista de todo lo anterior, disentimos del curso de acción que sigue la mayoría del Tribunal en el caso de autos. Conforme a la letra clara de la L.P.A.U., el asunto no es revisable por la vía de un recurso de revisión administrativa ante el Tribunal de Apelaciones ni ante esta Curia. Por ello, contrario al criterio mayoritario, revocaríamos al Tribunal de Apelaciones pero remitiríamos el asunto al tribunal de instancia para que dilucidara con carácter prioritario los méritos de la controversia, conforme al mecanismo de la sentencia declaratoria. De esta manera, los peticionarios hubiesen tenido la oportunidad de tener su día en corte para probar que tienen un derecho a continuar recibiendo el servicio de escolta de la Policía, que han tenido desde que cesaron en sus funciones, y que fueron privados de dicho interés sin oportunidad de ser oídos.

 Cabe señalar que en respuesta a la comunicación del Superintendente, el ex gobernador Hernández Colón le requirió que le informara los periodos en que se brindó el servicio de escoltas al resto de los ex gobernadores y, además, le solicitó una afirmación de que “en virtud del memorando del Honorable Señor Gobernador, usted no puede acceder a mi petición para continuar el servicio de escolta más allá del 31 de diciembre de 2006”. Apéndice de Petición de certiorari, Caso Núm. CC-07-347, pág. 139. El Superintendente no contestó estos requerimientos.

 El Art. 30 de la Ley de la Policía, supra, dispone:
“(a) La Policía de Puerto Rico tendrá la responsabilidad de proveer seguridad y protección al Gobernador de Puerto Rico y a su familia.
“(b) Además, tendrá la responsabilidad de proveer seguridad y protección al Superintendente y a su familia, durante el término de su incumbencia. Dicho servicio continuará, una vez éste cese en funciones por cuatro (4) años adicionales y podrá ser extendido previa solicitud y aprobación del Superintendente que lo sustituya.
“La naturaleza del servicio de protección al ex Superintendente será similar a la ofrecida durante su incumbencia como Superintendente.
“(e) Aquellos funcionarios o ex funcionarios a quienes la Policía les provea servicio de escolta, seguridad y protección sólo tendrán derecho a recibirlo en la jurisdicción o territorio de Puerto Rico, con excepción del Gobernador de Puerto Rico. En aquellos casos excepcionales o meritorios en los cuales se solicite servicio de escolta, seguridad y protección fuera de la jurisdicción de Puerto Rico, el mismo será otorgado con la previa aprobación del Superintendente y el Gobernador. En caso de que la solicitud de escolta suija de algún funcionario, los gastos correspondientes a dietas, horas extras, transportación y alojamiento serán pagados por la agencia o dependencia que representa el funcionario que solicita el servicio.” 25 L.P.R.A. see. 3129.

 Véase Boletín Administrativo Núm. 5550. Esta orden ejecutiva indica los requisitos en el formato de las referidas órdenes, así como los pasos a seguir en la preparación y registro del documento.

 Entre otras cosas, no tenemos certeza sobre los criterios de la Policía para la asignación de personal a los ex Gobernadores, la cantidad de agentes que habían sido designados para dicha encomienda desde que cada uno cumplió su término, el tipo de seguridad provista, el gasto que conllevaba dicho servicio, los lugares en que se ofrecía, si alguna vez el servicio fue suspendido o reducido, o si los peticionarios han recibido alguna amenaza o han estado expuestos a algún peligro durante estos años.